***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Dollar with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Reliance Insurance Company, now insolvent, was the carrier on the risk with Cambridge Integrated Services as its servicing agent. The NC Insurance Guaranty Association was their successor in interest for this claim.
3. The employment relationship existed between the parties at all relevant times.
4. Claimant's average weekly wage was $1,001.81, which yields a maximum compensation rate of $588.00 per week, based upon the Form 22.
5. Claimant sustained a compensable injury by accident arising out of and in the course of his employment on 27 July 2000, as a result of which he sustained burns to his face, neck and hands. Defendants paid benefits to claimant pursuant to an I.C. Form 60.
6. Claimant returned to work with City Transfer and Storage Company on or about 5 September 2001, earning $13.00 per hour.
7. Upon returning to work, defendants paid claimant temporary partial disability benefits under N.C. Gen. Stat. § 97-30, based upon an average weekly wage of $972.44, due to calculations contained in a letter from the Industrial Commission, dated 29 May 2001.
8. The Commission ordered this case into mediation, and a mediated settlement conference was held on 25 June 2002 in High Point, North Carolina, with claimant being represented by Pam Foster and James Walker serving as mediator.
9. After lengthy negotiations, the parties executed a mediation agreement, which has been submitted as an exhibit the hearing.
10. Claimant executed the finalized Final Compromise Settlement and Release Agreement on July 1, 2002.
11. Claimant received and accordingly proceeded to cash his $10,000.00 advancement check on July 3, 2002.
12. Claimant passed away on or about 4 July 2002 or early the morning of July 5, 2002, due to methadone poisoning.
13. Commission Mediation Coordinator John Schafer informed defense counsel that the mediator (James Walker) was not permitted to file an affidavit or testify at the hearing of this matter in any form since he served as a mediator in the case. Defendants preserve their right to appeal Mr. Schafer's ruling, if needed after the hearing.
14. The issues for determination are:
a. Should the parties be ordered to submit the Settlement Agreement, executed by claimant, to the Commission for review?
b. Was Kenneth Glenn Fowler's death sufficiently related to the compensable injury to require the payment of death benefits by defendants to his beneficiaries?
c. Should defendants be ordered to pay penalties and/or attorney's fees?
d. If the Agreement is ordered to be submitted to the Commission and is approved based on fairness, are defendants entitled to any assessment of attorney's fees against plaintiff's estate for having no good faith basis for not complying with the Settlement Agreement reached by the parties at the June 25, 2002 mediation?
15. The following documentary evidence was submitted into the record:
a. Medical and Rehabilitation Records;
b. I.C. Form 18, filed March 26, 2001 and submitted on February 19, 2001;
c. Letter from Crumley Associates to the Chief Claims Examiner, dated May 23, 2001, requesting average weekly wage computation;
d. Plaintiff's Motion for Adjustment of the Compensation Rate, filed April 6, 2001;
e. Commission Letter, dated May 29, 2001, computing the average weekly wage;
f. Commission Letter, dated June 13, 2001, regarding the computation of average weekly wage;
g. I.C. Form 18, filed January 30, 2003;
h. I.C. Form 33, filed February 24, 2003;
i. I.C. Forms 42, Applications to Appoint Guardians Ad Litem for the minor children of Kenneth Glenn Fowler, filed March 12, 2003;
j. Order of Removal, filed July 10, 2002;
k. Letter from Crawford to Mr. Fowler, dated October 17, 2001;
l. Letter from Crumley Associates to Cambridge, dated December 11, 2001;
m. Letter from Crumley Associates to Cambridge, dated January 9, 2002;
n. Letter from Crumley Associates to Cambridge, dated January 28, 2002;
o. Payment history from Crawford Company from August 11, 2000 to October 19, 2001, three pages;
p. Payment history from Cambridge from January 23, 2003 to June 19, 2002, three pages;
q. Payment history from Martin Boyer Company, Inc., dated August 26, 2003, three pages; and
r. Letter of December 9, 2003, stipulating the average weekly wage used to calculate temporary partial disability payment was $972.44.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On July 27, 2000, Kenneth Glenn Fowler (hereinafter, claimant) was a thirty-five year-old male. He had been married to Cheryl Fowler since 1992. There were three biological children born of the marriage, Shelby Sloan Fowler, Colin Rayce Fowler, and Corbin Miles Fowler.
2. Claimant was previously married, and after a protracted custody battle, was awarded legal custody of the minor child born of that prior marriage, Cori Nicole Fowler.
3. Defendant-employer, a fabricator of racecar bodies, was owned and operated by LeeAnn DeHart and Gene DeHart. Mrs. DeHart was also claimant's sister. They hired claimant to work in the automotive shop in 1997, shortly after starting the business. Prior to and throughout the course of his employment with defendant-employer, claimant engaged in a habit of abusing prescription and illegal drugs. In fact, he was sent home many days from work due to his substance abuse and resulting impairment. On other occasions, the DeHarts would not let claimant leave the premises until some of the controlled substances had worn off. He was also assigned light duty jobs when he was not otherwise capable of working due to his drug use and impairment.
4. In approximately 1998, claimant filed for bankruptcy. After losing their home, the Fowlers applied to lease an apartment at Westchester Key Apartments. Complex manager Candy Sapp ran a credit check and learned of their poor credit history and bankruptcy. She had to obtain approval from her district manager to lease an apartment to the Fowlers. In addition, she obtained a guarantee from LeeAnn DeHart for payment of the rent. Claimant was permitted to move in on or about May 5, 2000.
5. On July 27, 2000, claimant sustained first and second degree burns to his hands, face, ears and neck when sparks from a welding torch ignited the lacquer which he was applying on the other side of the car.
6. Following the compensable injury, claimant was initially taken to High Point Regional Medical Center. He was transferred to the Burn Unit at Wake Forest University Baptist Medical Center, where he was treated from July 27 to July 31, 2000. There was no evidence of vascular compromise, paresthesia or compartment syndrome. Although a plastic surgeon was called in to consult on the case, no other treatment was necessary.
7. By August 20, 2000, doctors at the Burn Unit noted, and the Full Commission finds as fact, claimant's burns to his face and hands had completely healed. He did continue to experience pain.
8. Following the compensable injury, the DeHarts began paying claimant the difference between his compensation rate and his prior salary. They continued to do so until claimant returned to work for another employer.
9. Claimant returned to the Burn Unit on October 3, 2000 with complaints of vision changes. These complaints were not causally related to the compensable accident. The doctor also noted claimant may be suffering from a mild post trauma depression and pain.
10. On October 18, 2000, occupational medicine specialist Dr. Dennis G. Egnatz saw claimant for a second opinion, during which he diagnosed him with post-traumatic stress disorder (PTSD). Dr. Egnatz prescribed Elavil for the PTSD, ordered a Nikken mask and gloves, and authorized claimant to return to medium level work with a seventy-five pound lifting restriction, limited heat/cold exposure, limit right hand grip and squeeze to a moderate level, avoid open flames and fire hazards, use protective gloves, and no exposure to solvents or irritants. Claimant was to begin working four hours per day, graduating to eight hours per day over a two-week period.
11. On October 23, 2000, psychologist Donald P. Patterson, Ph.D., began treating claimant for PTSD, sleep difficulty and excessive fearfulness. By December 20, 2000, Dr. Patterson released him from treatment after his symptoms significantly improved. Dr. Patterson discussed claimant's plan to return to work with defendant-employer in an office job. Dr. Patterson opined claimant was non-compliant throughout the course of the treatment. After the December 20, 2000 release, plaintiff did not return to Dr. Patterson.
12. By October 31, 2000, claimant was instructed he was medically released to return to work. The doctor also instructed claimant that he was taking excessive pain medication.
13. By January 17, 2001, Dr. Egnatz opined and the undersigned find as fact, claimant reached maximum medical improvement from the burns, stress disorder, depression and sleep problems. He prepared an I.C. Form 25R, with an explanatory letter and photographs.
14. Based upon the Form 25R, the Commission issued a letter, dated February 13, 2001, in which it found claimant was entitled to $2,000.00 for disfigurement/scarring to his hands and $5,000.00 for the facial disfigurement/scarring. The letter further provided either party had the right to request a viewing before a Deputy Commissioner should they disagree with the evaluation.
15. At the February 27, 2001 appointment, claimant told Dr. Egnatz he had applied for a crane operator job. However, he was not hired at the time due to his pain medications.
16. On March 21, 2001, Dr. Egnatz saw claimant for a scheduled appointment. Claimant and his wife attended the appointment, at which time claimant reported increased depression and frustration over not having started work, and he remarked about "going postal". However, after discussing the situation further, Dr. Egnatz found claimant did not really intend to harm anyone. Dr. Egnatz saw claimant on April 4, 2001, at which time he expressed sadness and depression over family situations. Dr. Egnatz prescribed Prozac and referred claimant to psychiatrist Dr. Thomas E. Lauer, who also specialized in treatment of chemical dependency.
17. On April 11, 2001, Dr. Lauer saw claimant, at which time he related a history of depression and PTSD due to the compensable injuries; personal problems due to a custody battle with his ex-wife over his twelve year-old daughter; continued to smoke at least half a pack of cigarettes per day even though he complained of problems being around hot and cold sources, as well as his prior treatment with Dr. Patterson for fearfulness and PTSD related to fire; and prior significant cocaine abuse and dependency. Dr. Lauer found claimant suffered from mild PTSD, severe obsessive-compulsive disorder, primary character disorder, pain medication addiction, depression and fearfulness. These conditions were related to family issues and not due to the compensable injuries. Due to claimant's chemical dependency, Dr. Lauer found he was unable to return to work.
18. On May 28, 2001, Dr. Lauer noted a telephone call from claimant's mother-in-law, Karen Philben, during which she reported claimant had a significant history of substance abuse and chemical dependency, which included abusing the prescription medications he was currently receiving. Dr. Lauer reported the substance of this conversation with Dr. Egnatz.
19. On May 29, 2001, claimant returned to Dr. Lauer, reporting he had attempted to commit suicide by taking a drug overdose. Dr. Lauer found claimant was very hostile, depressed and suicidal, due to chemical dependency and family problems. These conditions were further exacerbated by his underlying disorders of primary character disorder and obsessive-compulsive disorder. Dr. Lauer admitted claimant to the High Point Behavioral Health Center for inpatient treatment. However, claimant failed to comply with the treatment.
20. Dr. Lauer found claimant had been non-compliant with recommendations for chemical dependency group therapy. At the June 5, 2001 appointment, Dr. Lauer further noted claimant refused to admit he ever had a chemical dependency problem, refused follow-up at Fellowship Hall, refused follow-up with the doctor, refused outpatient treatment at High Point Behavioral Health, and refused any other treatment option.
21. On June 6, 2001, claimant returned to Dr. Egnatz, at which time he reported having used medicine manipulation and the attempted drug overdose. Dr. Egnatz found he had significant hostility. In addition, Dr. Lauer called to inform Dr. Egnatz the claimant had forged Darvocet prescriptions.
22. On June 12, 2001, Dr. Lauer saw claimant, at which time he was still taking Risperdal, Effexor and Ambien. At the conclusion of the session, Dr. Lauer noted claimant continued to be emotionally stable, was able to smile, and was agreeable to go to Fellowship Hall for two weeks of in-patient treatment followed by two weeks of intensive outpatient treatment.
23. On June 26, 2001, Dr. Lauer again discussed claimant's case with Dr. Egnatz, during which Dr. Egnatz indicated there were two prescriptions for Darvocet which Dr. Egnatz did not issue, and which bore the name Cheryl Philben (Mrs. Fowler's maiden name), and further that these prescriptions had been refilled. This conduct reflected the potential for four felony counts. The doctors agreed claimant's chemical dependency issues were not being adequately addressed; and as a result, he ran the risk of succumbing to his dependency. Criminal charges were later filed against claimant due to the prescription fraud.
24. At the July 17, 2001 appointment, claimant reported to Dr. Lauer that he had completed inpatient treatment at Fellowship Hall. Although he was not cooperating fully with treatment recommendations, Dr. Lauer noted claimant was making progress, and he authorized claimant to participate in vocational rehabilitation or to return to work. By August 22, claimant reported having a job offer as a crane operator. Although Dr. Lauer again noted claimant had not participated in the After Care Program at Fellowship Hall, he did find he continued to make progress. Dr. Lauer last saw claimant on September 17, 2001, at which time he reported using skin cream to help with the sun irritation on the job. He further indicated he had no problems operating the crane. Dr. Lauer found claimant's chemical dependency and depression were in good remission, even though claimant refused to participate in the After Care Program or to get a Narcotics Anonymous sponsor.
25. Even after his release from Fellowship Hall, claimant continued to forge or otherwise obtain prescription medication without a valid medical order.
26. Upon his return to work, claimant elected to receive temporary partial disability benefits rather than the permanent partial disability benefits.
27. On September 18, 2001, claimant's attorney called Dr. Egnatz regarding claimant's return to work and a follow-up appointment was set for September 26, 2001. In that appointment, claimant reported he had returned to work as a crane operator, and he felt he had made good physical and mental progress. Based upon their discussion, Dr. Egnatz found the crane operator job suitable to claimant's restrictions, and further found the job beneficial to claimant's overall well being. During the course of his treatment with Dr. Egnatz, claimant never admitted having a prior history of substance abuse, never informed him of his wife's affairs, never discussed the prior bankruptcy, and otherwise was not forthright in discussing his history and stressors. Claimant's failure to provide pertinent information adversely affected how Dr. Egnatz treated his depression.
28. Dr. Lauer and Dr. Egnatz conferred on or about October 8, 2001, at which time Dr. Egnatz stated the claimant had confessed to altering a prescription for Darvocet and admitted to ordering additional prescription medications on-line.
29. Between October of 2001 and April of 2002, the carrier was in bankruptcy and all cases were suspended due to the automatic stay. Claimant did not receive temporary partial disability between October and February 2002. However, he was paid for the back benefits.
30. On April 17, 2002, claimant presented at Regional Psychiatric Associates where Dr. Michael McClure saw him for complaints of depression due to the injury, family problems with his ex-wife and sister, and his obsessive-compulsive disorder. He reported a history of heavy alcohol and cocaine use. However, during the appointment, claimant did not advise Dr. McClure of his wife's affairs or the prior bankruptcy. He continued to take Effexor and Risperdal. Dr. McClure adjusted the medications. By June 5, 2002, Dr. McClure found claimant's mood had improved, and he recommended follow-up psychotherapy. However, claimant failed to comply with the therapy recommendations.
31. During the course of his employment with City Transfer, supervisor Ronald Lassiter had to send claimant home on one occasion due to his having the smell of alcohol on his breath. Claimant discussed his family situations at work on at least four occasions, during which he told Mr. Lassiter that his wife was having affairs, that she would show up on Friday mornings to collect his paycheck, and would spend all of their money on weekend trips.
32. Claimant would take the rent payments to the apartment office, and he spoke with Ms. Sapp. Beginning in February of 2001, Ms. Sapp had greater contact with claimant, after the Fowler's began making late rent payments. The Fowlers were late with their rent in February, March, August, September, October, November and December of 2001, and again in January, March, April and May of 2002. Ms. Sapp discussed these late payments with claimant, at which he would tell her he was waiting to get his check to pay or that he was working with his lawyer to get his checks on time. Although he did not know Ms. Sapp well, claimant informed her on at least one occasion that his wife was having an affair; and she had taken the rent money to go to the beach for the weekend. As of June 17, 2002, Ms. Sapp initiated eviction proceedings against claimant and his family due to late rent payments, as the Fowlers were 16 days late at that time. At the June 28, 2002 eviction hearing, judgment for possession and assessment of court costs were entered in favor of the lessor. Neither claimant nor his wife appeared at the eviction proceeding, despite being served with notice by the Guilford County Sheriff's Department. However, Ms. Sapp did not initiate actually evicting claimant from the apartment, after claimant assured her the payment would be made before July 1, 2002.
33. On June 19, 2002 at 8:38 a.m., High Point City Police Officer Jay Yandle responded to a motor vehicle accident at which he found the claimant had rear-ended another vehicle. During the course of his investigation and based upon his twelve-and-one-half years of law enforcement training and experience, Officer Yandle found claimant to be extremely impaired to such an extent he was uneasy and off-balance getting out of his vehicle and even fell to the ground, requiring the officer's assistance to stand and walk at the scene. In addition, claimant's speech was slurred and thick-tongued. The officer determined that based upon claimant's condition, it would be dangerous to attempt a field sobriety test. Claimant was arrested and taken to High Point Regional Medical Center for a blood test. However, before the court date, Officer Yandle learned claimant had died. The toxicology report revealed the presence of barbituates, benzodiazepines and phencyclidine.
34. The weekend before the mediation conference, claimant's wife went to the beach for the weekend with a man named John Carter, her brother John Philben and his wife, and their two daughters. She left claimant at home alone with his four children. She had also left claimant on other occasions, either for a day at a time, or for a weekend. Although she contended at the first hearing that claimant did not help much with the children or was unable to care for the children, this testimony is specifically rejected as not being credible in light of the fact that she left him alone with the children on these occasions.
35. At the mediation conference, the parties reached a resolution and prepared and signed a Mediation Agreement. The Mediation Agreement, dated June 25, 2002, provided defendants would pay $60,000.00 in a lump sum; pay the mediation fee; would advance $10,000.00 of the $60,000.00 upon receipt of the clincher signed by plaintiff and his counsel; would pay temporary partial disability until the Industrial Commission entered the Order approving the clincher; would pay all unpaid medicals including psychologist (sic)/psychiatrist, through today (the date of the agreement); the clincher and advance will be received by Friday, June 28, 2002.
36. The Mediated Settlement Agreement was signed by all parties and definite to its terms sufficient to satisfy the requirement of I.C. Rule 502. This Agreement is fair and just and in the best interests of the parties. Therefore, the mediation agreement is enforceable.
37. After the June 25, 2002 mediation conference, defense counsel drafted the agreement and transmitted it to claimant's counsel. By letter faxed June 27, 2002, plaintiff's counsel forwarded proposed revisions to the settlement agreement. After the settlement agreement was finalized, defense counsel forwarded it to claimant's counsel for her client's signature on July 1, 2002. Both claimant and his attorney signed the agreement and faxed it back to defense counsel on July 1, 2002.
38. Under the terms of the settlement agreement, defendants agreed to pay claimant $60,000.00 ($10,000.00 was advanced to claimant upon signing the agreement); to pay temporary partial disability until the agreement was approved by the Commission; and to pay medical benefits to June 25, 2002, the date of the agreement.
39. Following the mediation, a compromise settlement agreement was submitted to claimant through his attorney for signature, as required by Rule 4(d) of the Commission's Rules for Mediation Settlement and Neutral Evaluation Conferences.
40. The compromise settlement agreement which claimant and Ms. Foster signed contained the terms of the agreement of the parties in the mediation agreement and is in compliance with I.C. Rules, and is fair and just and in the best interests of the parties.
41. After cashing the $10,000.00 advance, claimant passed away either late on July 4 or early on July 5, 2002 of methadone poisoning. Cheryl Fowler found her husband dead on the floor of the apartment the morning of July 5, 2002. The Police Report reflected the cause of death to be narcotics overdose. Dr. Thomas B. Clark, II, prepared the Autopsy Report, which reflected methadone poisoning as the cause of death.
42. There is no evidence that any legal basis exists to void or otherwise set aside the contract the parties entered into as a result of the mediation. There is also no evidence claimant was impaired or otherwise lacked capacity to enter into a settlement agreement.
43. At the initial hearing in this matter, Cheryl Fowler testified she had a happy marriage. She denied any prior drug or cocaine use by her husband. She also denied any prior financial problems or any problems paying rent. Her testimony is specifically rejected as not being credible as there is competent evidence of record that there were both martial and financial problems, as well as drug use. Ms. Fowler denied any knowledge as to how the claimant may have obtained methadone prior to his death, however, the competent evidence in the record supports a finding that she, her husband and his sister Laura Lynn purchased the methadone together and took it the evening of July 4, 2002. Ms. Fowler's testimony is rejected as not credible.
44. Neither Dr. Egnatz nor any of claimant's other treating physicians or medical or psychiatric professionals prescribed methadone for claimant during the course of his treatment due to the compensable injury.
45. At some point following claimant's death, his former attorney, who presently represents the widow in this matter, advised defense counsel her client did not plan to comply with the terms of the settlement agreement and would not submit it to the Commission.
46. Claimant had never been declared incompetent and no legal guardian had ever been appointed to act on his behalf either prior to or at the date of the signing of the settlement agreement. To the contrary, he was represented by legal counsel at the mediation and at the time he signed the settlement agreement. At no time during the proceedings before the Commission did claimant's counsel inform defendants or the Commission of any inability of her client to proceed on his own behalf. Further, the fact that plaintiff failed to identify a missing medical record does not indicate incompetence.
47. There is no competent evidence in the record to support a finding that the claimant's death by methadone poisoning was causally related to the admittedly compensable injuries. Rather, his death was due to his recreational drug abuse.
48. On November 10, 2003 the parties deposed Dr. Tommie Fantine Lauer, formerly Dr. Thomas E. Lauer, whose name was legally changed in September of 2003. The deposition lasted approximately six hours. At approximately 1:30 p.m., the parties took a lunch recess. Dr. Lauer went to lunch with plaintiff's counsel and her associate, and Ms. Foster paid the bill.
49. Despite notations in her treatment records to the contrary, in her deposition testimony after the lunch break, Dr. Lauer opined claimant's death was caused, aggravated or accelerated by his compensable injury. Dr. Lauer's deposition testimony is specifically rejected as not being credible evidence.
50. On or after July 5, 2002, claimant's widow discussed the settlement and thereafter, defendants were informed the original agreement signed by claimant would not be forwarded to defense counsel. Mrs. Fowler testified she did not believe $50,000.00 was enough money for her children.
51. This claim was defended upon reasonable grounds.
52. As the mediation agreement constitutes a valid agreement in accordance with I.C. Rule 502, the settlement agreement submitted at the hearing shall be reviewed by the Industrial Commission once defendants have signed it, for a determination as to whether the agreement is fair, just and in the best interests of the parties.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682(1982). In the instant case, there is no competent evidence to support a finding claimant's death was causally related to the admittedly compensable injuries. Rather, he died as a result of methadone poisoning which was due to his recreational drug abuse.
2. The Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. Expert opinion that rests on speculation and conjecture, or unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Young v. HickoryBusiness Furniture, 353 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, Dr. Lauer's opinion testimony is specifically rejected as not sufficiently reliable to qualify as competent evidence on the nature and cause of death. Rather, the testimony, which directly conflicts with the psychiatric notes of the patient, must be rejected as biased or otherwise tainted.
3. As claimant's death was not causally related to the compensable injury, his beneficiaries are not entitled to death benefits under N.C. Gen. Stat. § 97-38, et seq.
4. Once a settlement agreement is reached during the mediation, whether or not it is executed by the parties, it is binding on them, and all that is left for the agreement to be submitted to the Industrial Commission for review and approval. Lemly v. Colvard Oil Company, 157 N.C. App. 99,577 S.E.2d 712 (2003).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 ORDER
1. The claim for death benefits is, and under the law must be, DENIED.
2. Defendants shall submit a fully executed copy of the Compromise Settlement Agreement to the Industrial Commission within 60 days.
3. Each side shall pay its own costs.
This the ___ day of January, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER